IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:16-CV-244-FL

| | | |
|---|---|---|
| CHRISTOPHER LIGHTFOOT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| GEORGIA-PACIFIC WOOD PRODUCTS, | ) | ORDER |
| LLC; GEORGIA-PACIFIC LLC | ) | |
| individually and as successor-in-interest to | ) | |
| Georgia-Pacific Corporation; and | ) | |
| WEYERHAEUSER COMPANY, | ) | |
| | ) | |
| Defendants.[1] | ) | |

This matter is before the court on defendants' motions for summary judgment (DE 209, 213). The motions have been briefed fully, and the issues raised are ripe for ruling. For the following reasons, the motions are granted.

## STATEMENT OF THE CASE

Plaintiff commenced this action in state court, in Fulton County, Georgia, on January 7, 2016, for personal injuries, including a form of sinonasal cancer, allegedly sustained as a result of exposure to wood dust associated with products manufactured and sold by defendants. Plaintiff asserts claims for negligence and products liability, and plaintiff seeks damages including compensatory and punitive damages.

---

[1] The court constructively amends the caption of this order to reflect dismissal of former defendants Weyerhaeuser NR Company and Lowe's Home Centers, LLC (NC) ("Lowe's"), and lack of service on defendant denominated John Doe # 1.

Defendants Georgia-Pacific Wood Products, LLC and Georgia-Pacific LLC (hereinafter "defendant Georgia-Pacific")[2] removed the case on February 15, 2016, on the basis of diversity jurisdiction, to the United States District Court for the Northern District of Georgia. That court sua sponte transferred venue to this court on July 1, 2016.

Following an initial period of discovery, defendants filed on December 1, 2017, motions under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993) ("Daubert motions") to exclude and strike certain expert opinions and reports. On September 20, 2018, the court granted in part and denied in part the Daubert motions, allowed certain sanctions in favor of defendants, allowed a period of supplemental expert discovery, and allowed for expanded summary judgment briefing to accommodate additional issues, if any, arising from supplemental expert discovery. See Lightfoot v. Georgia-Pac. Wood Prod., LLC, No. 7:16-CV-244-FL, 2018 WL 4517616, (E.D.N.C. Sept. 20, 2018) ("September 20, 2018, Order").

On December 21, 2018, the court denied defendants' motion for reconsideration, made further determination regarding attorney's fees regarding expert discovery, and clarified the scope of expert testimony of plaintiff's expert, Rachael Jones ("Jones"). See Lightfoot v. Georgia-Pac. Wood Prod., LLC, No. 7:16-CV-244-FL, 2018 WL 6729636 (E.D.N.C. Dec. 21, 2018) ("December 21, 2018, Order").

Defendants filed the instant motions for summary judgment on June 3, 2019. In support of its motion, defendant Georgia-Pacific relies upon a memorandum of law, statement of material facts, and the following exhibits: 1) depositions of plaintiff and plaintiff's father, Thomas

---

[2] For purposes of the instant motions, the court refers to "Georgia-Pacific" in the singular, only for ease of reference, where defendant Georgia-Pacific advances arguments equally and without distinction for both Georgia-Pacific LLC and Georgia-Pacific Wood Products, LLC, subject to reservations stated in its memorandum in support of summary judgment. (See Georgia-Pacific ("G-P") Mem. (DE 22) at 1 n. 1). In citations, the court abbreviates the name defendant Georgia-Pacific further to "G-P," and defendant Weyerhaeuser to "Wy."

Lightfoot, Sr. ("Thomas Lightfoot, Sr." or "T. Lightfoot"); 2) depositions of plaintiff's experts Kristan J. Aronson ("Aronson"), Margaret Brandwein-Weber ("Brandwein-Weber"), Jeremiah Boles ("Boles"), and Jones, as well as expert reports of Aronson and Brandwein-Weber; 3) depositions of defendants' experts, Eric J. Boelhouwer ("Boelhouwer") and Jennifer Sahmel ("Sahmel"), and report of Boelhouwer; 4) plaintiff's responses to interrogatories and correspondence regarding the same; 5) World Health Organization International Agency for Research on Cancer ("IARC") monographs dated 1981 and 1995; 6) Material Safety Data Sheets ("MSDS") for "wood dust" generated by defendant Georgia-Pacific; 7) printout of a United States Department of Labor Occupational Safety & Health Administration ("OSHA") webpage and an "ACGIH" report regarding wood dust; and 8) printouts of OSHA correspondence and agency documents.

In support of its motion, defendant Weyerhaeuser Company ("Weyerhaeuser") relies upon a memorandum of law, statement of material facts, and the following exhibits, in addition to those categories of documents relied upon by defendant Georgia-Pacific: 1) expert reports and declaration of Jones; 2) expert reports of Marion J. Fedoruk ("Fedoruk") and Ellen T. Chang ("Chang"); 3) IARC monograph dated 1987; 4) depositions of Weyerhaeuser employee, Van Fidino; former employee and corporate representative of former-defendant Lowe's, John Steed ("Steed"); and Fedoruk; 5) reports on wood dust and cancer by the U.S. Department of Health and Human Services ("HHS"), National Institute for Occupational Safety and Health ("NIOSH") (2017), and National Toxicology Program ("NTP") (2016); and 6) MSDSs and other internal documents and correspondence regarding "wood dust" generated by defendant Weyerhaeuser.

In opposition to defendant Weyerhaeuser's motion for summary judgment, plaintiff relies upon a memorandum of law, response statement of facts, and the following exhibits, in addition

to those categories of exhibits already relied upon by defendants: 1) additional report on wood dust and cancer by NTP; 2) copies of rules published in the Federal Register, by OSHA, titled Hazard Communication ("HazComm"); 3) declaration of Thomas Lightfoot, Sr.; 4) Weyerhaeuser interoffice communications; 5) a NIOSH report (June 1987); 6) copies of articles published in medical and scientific journals; 7) depositions of plaintiff's brother, Thomas Gene Lightfoot, and mother, Faye Welch Lightfoot; Georgia-Pacific employee, David Hughes ("Hughes"); 8) expert reports and declarations by Boles and Aronson; and 9) additional internal Weyerhaeuser documents related to wood dust.

In opposition to defendant Georgia-Pacific's motion for summary judgment, plaintiff relies upon a memorandum of law, response statement of facts, and the following exhibits, in addition to exhibits already relied upon: 1) a copy of a NIOSH document described as "OSHA coments from the January 19, 1989 Final Rule on Air Contaminants Project extracted from 54 FR 2332 et seq."; 2) cover page to IARC 1977 monograph on asbestos; 3) deposition of defendant Georgia-Pacific's expert James J. Stark ("Stark"); and 4) a copy of rules published by OSHA in Federal Register, June 7, 1972, relating to asbestos dust.

Defendants filed replies in support of the instant motions on July 22, 2019, each relying upon a reply statement of material facts, as well as Appendix 4 to the 1981 IARC monograph, defendant Lowe's responses to plaintiff's discovery, and categories of depositions and discovery responses previously relied upon.

## STATEMENT OF FACTS

The court previously summarized certain background facts in the record derived from deposition testimony of plaintiff and plaintiff's father, viewed in the light most favorable to plaintiff, in its September 20, 2018, order, as follows:

4

Plaintiff was born on July 16, 1974. (Pl's Dep. 12). He lived with his family at a house in Winfall, Perquimans County, North Carolina, as a child until he left for college in Fall 1992. (Id. 34, 104). Plaintiff's father maintained a building in the back yard of the property as a woodworking shop (the "wood shop" or "shop") during the time that plaintiff was living at home. (Id. 214). The shop was about 20 feet square with a concrete pad, one window, an[d] one entryway comprised of an outer "barn door" and an interior door. (Id. 215-216). The shop was expanded by another 10 to 15 feet on one side in 1988. (Id. 298-299).

In the shop, there was a workbench, tool cabinet, and space for overhead wood storage. (Id. 218-221). The shop did not have mechanical ventilation or air conditioning, and the doors were kept open when it was hot. (Id. 215-217). There were a number of tools in the shop including a table saw, circular saw, band saw, sanders, grinders, drills, and other woodworking tools. (T. Lightfoot Dep. 45, 127-129).

Plaintiff's father engaged in substantial woodworking activities in the wood shop during the years that plaintiff was at home. Plaintiff's father made 15 to 20 picnic tables per year; 30 to 50 vegetable bins per year; 30 to 50 trash cans per year; and four to five chair swings per year. (Pl's Dep. 258-260, 296). Plaintiff's father made these items to sell to individuals in and around the community where he lived. (Id. 231, 240-241, 388-389). Plaintiff's father also made items for the family, including kitchen cabinets, an entertainment center, and fence slats. (Id. 271-275). He completed home remodeling projects, including flooring, paneling, and stairs. (Id. 283-287). Starting during plaintiff's senior year of high school (1991-1992), plaintiff's father refinished furniture for individuals in the community. (Id. 264-267).

Plaintiff's father acquired the wood used for the aforementioned projects primarily (about 60%) from a Weyerhaeuser mill where he worked as a mechanic, taking from a source of "reject wood" or "no value" in the mill. (T. Lightfoot Dep. 69, 76). Such wood was "mostly" pine. (Id.). Plaintiff's father acquired the remainder of his wood from Lowe's and Builders Discount Supply. (Id. 70). Such wood was supplied by Weyerhaeuser and Georgia-Pacific, and it was comprised of "mostly" pine and "some oak." (Id. 71, 74). Plaintiff's father used a "combination of pine and oak . . . sometimes." (Id. 74, 81). Pieces were constructed in the form of boards of various sizes and "plywood." (Id. 72). The entertainment center was constructed of birch and plywood. (Id.; Pl's Dep. 275). The vegetable bins were constructed of "mainly pine" but also birch "from time to time." (Pl's Dep. 243).

Plaintiff assisted his father with the aforementioned projects in varying amounts and with varying tasks between the age six (in 1981) and 18 (in 1992). Between the age six to nine, plaintiff mainly assisted with cleaning in the shop, including sweeping and shoveling wood dust, handing tools to his father, and moving items around the shop. (Pl's Dep. 221-223; T. Lightfoot Dep. 62). He also used a "little" electric sander. (T. Lightfoot Dep. 133). Beginning at age ten, plaintiff used a range of tools such as power drill, saws, and sanders in assisting

with all phases of his father's wood projects, in addition to continuing with cleaning in the shop. (Id.; Pl's Dep. 234-235, 250-251).

With respect to hours spent in the shop, plaintiff typically spent about five hours a week in the shop between age six to nine; 20-25 hours per week between ages ten and 18 (Pl's Dep. 224, 251-253). These amounts varied in some years and seasons of the year depending on other activities in which plaintiff was involved. For example, plaintiff worked in the shop less in his senior year (1991-1992) because he had a 20-30 hour per week job at Hardees. (Id. 221). In the start of his tenth grade year, August through November 1989, plaintiff played junior varsity football. (Id. 85-86). Plaintiff worked more hours in the shop in springtime and summertime than wintertime. (Id. 230). 70 percent of such time was spent inside the shop and 30 percent outside. ([Id.] 229).

Plaintiff attended college at North Carolina A&T University, where he obtained a bachelor's of science in electrical engineering. (Id. 104-105). Plaintiff also more recently earned a master's degree in management from Georgia Tech University. (Id. 106). Plaintiff has worked in several positions in the technology and telecommunications industry, and is presently employed by Google, Inc. (Id. 124).

In April 2014, plaintiff was diagnosed with "intestinal-type adenocarcinoma" ("ITAC"), a form of sinonasal cancer ("SNC"). (DelGaudio Dep. 18; Saba Dep. 18).

(Sept. 20, 2018, Order at 6-8).[3]

Additional undisputed facts as pertinent to the instant motions may be summarized as follows. Plaintiff's father worked at the Weyerhaeuser lumber mill in Plymouth, North Carolina, for approximately thirty years, including the time period from 1981 to 1992 when plaintiff was working in their home shop (the "exposure period"). (Pl's Opp. Wy. Stmt. (DE 219) ¶ 63; Pl's Opp. G-P Stmt. (DE 222) ¶ 8).[4] His job duties as a mechanic at the mill were not to process lumber or wood, but rather to repair machinery. (Pl's Opp. Wy. Stmt. (DE 219) ¶ 64).

_____

[3] Where there are multiple copies of deposition excerpts in the court's file, citations to page numbers of deposition transcripts correspond to the page showing on the face of the underlying transcript, and not the page number designated by the court's case management and electronic case filing (CM/ECF) system.

[4] Where a fact asserted in a party's statement of material facts is undisputed, the court cites to the opposing party's responsive statement of facts, where it indicates the fact is admitted or undisputed or without opposing fact, in pertinent part.

The 1981 IARC monograph states: "There is *sufficient evidence* that nasal adenocarcinomas have been caused by employment in the furniture-making industry. The excess risk occurs mainly among those exposed to wood dust." (DE 211-9 at 88) (italics in original).[5]

An internal Weyerhaeuser "technical report," dated March 5, 1981, states:

> Much of the current research devoted to investigating the health effects of wood and wood dust say that some wood dusts have a tendency to promote dermatitis, mucosal irritation, pulmonary disease (lung disease), and nasal cancer. <u>Yellow pine has not been implicated as a wood capable of eliciting mucosal irritation, lung disease or nasal cancer</u>.

(DE 220-43 at 14) (underlining in original).

In 1983, OSHA promulgated its first HazCom rule, for the purpose of ensuring that "the hazards of all chemicals produced or imported by chemical manufactures or importers are evaluated, and that information concerning their hazards is transmitted to affected employers and employees within the manufacturing sector." (48 Fed. Reg. 53340). "This transmittal of information is to be accomplished by means of comprehensive hazard communication programs, which is to include container labeling and other forms of warning, material safety data sheets and employee training." <u>Id.</u> The rule expressly exempted "[w]ood or wood products" from its requirements. (<u>Id.</u>).

The 1983 HazCom rule states the following with respect to carcinogens:

> OSHA has determined that a definition criteria for what constitutes a carcinogen for purposes of this standard is necessary since there may be differences of opinion concerning certain substances . . . . OSHA has concluded that a chemical is to be identified as one which poses a carcinogenic hazard when either the National Toxicology Program [NTP], the International Agency for Research on Cancer [IARC], or OSHA itself, publishes a finding that the available information indicates the chemical is a potential or confirmed carcinogen. Employers can determine whether a chemical meets these by consulting the publications of these organizations, or by looking it up in the NIOSH Registry of Toxic Effects of

---

[5] Citations to page numbers of documents in the record designated by a docket entry ("DE") number correspond to the page number provided by the court's CM/ECF system, and not the page showing on the face of the underlying document, if any.

> Chemical Substances (RTECS). RTECS entries indicate the findings of NTP, IARC, and OSHA.

(48 Fed. Reg. 53295). In addition, this rule states: "OSHA has defined a carcinogen for purposes of communication of hazards as any substance found to be a confirmed or suspected carcinogen by the International Agency for Research on Cancer [IARC], the National Toxicology Program [NTP], or OSHA. Use of these sources should eliminate much controversy involved in defining and identifying carcinogens." (48 Fed. Reg. 53336).

A Georgia-Pacific MSDS for "wood dust" bearing an "effective date" of September 1985 states: "Avoid prolonged or repeated breathing of wood dust in air." (DE 211-10 at 4, 7). Regarding carcinogenicity, it states: "Not listed in Second Annual Report on Carcinogens, NTP, 1981." (Id. at 5). Under the heading "other pertinent data" it states: "Exposure to wood dust has been statistically associated with nasal cancer in British furniture workers. (CODATA Bulletin, November 1978)." (Id.).

The 1987 NIOSH report states:

> The association between nasal cancer and occupations involving exposure to wood dust has been clearly established in the literature. . . [T]he association between nasal adenocarcinoma and wood dust exposure is particularly strong among furniture industry workers, although other woodworkers have also been shown to be at risk. Similarly, exposure to hardwoods has been implicated most often, but there are several reports implicating softwoods as well.

(DE 215-24 at 33).

The 1987 IARC monograph reported "an increased risk of nasal adenocarcinoma among workers in the furniture and cabinet-making industry." (DE 215-11 at 5). "Epidemiological data reported here and previously . . . provides sufficient evidence that nasal adenocarcinomas have been caused by employment in the furniture-making industry. The excess risk occurs (mainly) among those exposed to wood dust." (Id. at 6).

8

In the preamble to a 1987 HazCom rule, OSHA stated: "OSHA never intended . . . that wood dust be excluded from the standard's coverage under the wood and wood products exemption." (52 Fed. Reg. 31863). It further stated: " 'Wood dust' is a recognized health hazard." (Id.).

Weyerhaeuser MSDSs, bearing "revised" dates April 1988 and July 1989, state: "Wood dust has been alleged to cause nasal / paranasal sinus cancer (certain European hardwoods, oak and beech)." (DE 215-27 at 2; 215-28 at 2).

Georgia-Pacific MSDSs for "wood dust" bearing an "effective date[s]" of October 1987 and July 1989 state: "Avoid prolonged or repeated breathing of wood dust in air." (DE 211-12 at 4, 7; DE 211-13 at 3, 4). Regarding carcinogenicity, they state: "Not listed as a carcinogen by IARC, NTP, ACGIH or OSHA." (DE 211-12 at 5; DE 211-13 at 3). Under the heading "other pertinent data," the July 1989 MSDS states: "Although Exposure to wood dust has been statistically associated with nasal cancer in furniture workers in Britain and some other countries, OSHA has recently regulated it as an irritant dust only." (DE 211-13 at 3).

The 1995 IARC monograph states: "occupational exposure to wood dust is causally related to adenocarcinoma of the nasal cavities and paranasal sinuses." (DE 211-14 at 202). As a concluding "Evaluation," the monograph states: "There is *sufficient evidence* in humans for the carcinogenicity of wood dust." (Id. at 204) (italics in original). As an "Overall evaluation," it states "Wood dust *is carcinogenic to humans*." (Id.) (italics in original). As a footnote to the "Overall evaluation," it states: "This evaluation is based on the observation of a marked increase in the occurrence of cancers of the nasal cavities and paranasal sinuses among workers exposed predominately to hardwood dusts." (Id.).

An internal Weyerhaeuser interoffice communication, dated February 1995, states: "In October, [IARC] identified wood dust as a known human carcinogen. . . . Under existing OSHA Hazard Communications rules, the IARC determination triggers certain notification and training requirements, including a wood dust hazard notice, updating the [MSDS] information, and employee training." (DE 215-30 at 1).

An October 11, 1995, letter published by OSHA states that, due to the findings in the 1995 IARC monograph, "the MSDS for hardwood species and those sheets for mixed species of hardwoods and soft woods must be identified as a carcinogen as required under 29 CFR 1910.1200(g)(2)(vii). MSDSs for softwood species (not mixed with hardwoods) do not have to be identified as being carcinogenic." (DE 211-26 at 2). It further states: "[T]here were two few studies to sufficiently evaluate the cancer risk attributable to the workplace exposure to softwood species. In the few studies that have been completed, the risk of cancer from exposure to soft woods appears to be elevated, however there is not enough evidence to make a final determination." (Id.).

According to the 2016 NTP report, "Wood dust is *known to be a human carcinogen*." (DE 215-25) (italics in original). According to the 2016 NTP report, it was "First listed in the *Tenth Report on Carcinogens* (2002)." (Id.).

Additional facts will be discussed in the analysis herein.

## COURT'S DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing

the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586-87 (1986) (internal quotation omitted). Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. <u>See</u> <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id.</u> at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." <u>Id.</u> at 255; <u>see</u> <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." <u>Lovelace v. Sherwin-Williams Co.</u>, 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment

as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489-90.

B.     Analysis

In opposition to summary judgment, plaintiff advances products liability and negligence claims based upon a failure to warn.[6] Both claims have the same essential elements: 1) duty, 2) breach, 3) causation, and 4) damages. See Stegall v. Catawba Oil Co. of N. C., 260 N.C. 459, 464 (1963); Crews v. W.A. Brown & Son, Inc., 106 N.C. App. 324, 329 (1992); N.C. Gen. Stat. § 99B-5. Negligence "generally comprehends a duty to warn of danger, the nonperformance of which will, when it is the proximate cause of injury, give rise to liability." Stegall, 260 N.C. at 464; see Fontenot v. Taser Int'l, Inc., 736 F.3d 318, 332 (4th Cir. 2013); Sparks v. Oxy-Health, LLC, 134 F. Supp. 3d 961, 992 (E.D.N.C. 2015). The court addresses in turn below the elements of duty and causation, which are determinative of the instant motions.

1.     Duty to Warn

A duty to warn, under North Carolina law, is codified in N.C. Gen. Stat. § 99B-5(a), which provides:

> (a) No manufacturer or seller of a product shall be held liable in any product liability action for a claim based upon inadequate warning or instruction unless the claimant proves that the manufacturer or seller acted unreasonably in failing to provide such warning or instruction, that the failure to provide adequate warning or instruction was a proximate cause of the harm for which damages are sought, and also proves one of the following:

---

[6]     Although plaintiff asserted claims based upon negligent design and manufacturing in the complaint (see, e.g., Compl. ¶ 24 (1)), plaintiff expressly abandons such claims in opposition to the instant summary judgment motions. (See Opp. to Wy. Mot. (DE 218) at 7 n. 2; Opp. to G-P Mot. (DE 221) at 8 n. 2).

(1) At the time the product left the control of the manufacturer or seller, the product, without an adequate warning or instruction, created <u>an unreasonably dangerous condition</u> that the manufacturer or seller knew, or in the exercise of ordinary care should have known, <u>posed a substantial risk of harm to a reasonably foreseeable claimant</u>.

(2) After the product left the control of the manufacturer or seller, the manufacturer or seller became aware of or in the exercise of ordinary care should have known that the product posed <u>a substantial risk of harm to a reasonably foreseeable user or consumer</u> and failed to take reasonable steps <u>to give adequate warning</u> or instruction or to take other reasonable action under the circumstances.

N.C. Gen. Stat. Ann. § 99B-5(a) (emphasis added). Language particularly pertinent to the instant analysis is underlined in the above quoted text.

North Carolina common law also recognizes similarly a duty to warn. "[A] manufacturer or seller of a product, which to his actual or constructive knowledge involves danger to users has a duty to give warning of such dangers." <u>Stegall</u>, 260 N.C. at 464. Liability arises for a supplier of a product, "if the supplier (a) knows, or from facts known to him should realize, that the chattel is or is likely to be dangerous for the use for which it is supplied; (b) and has no reason to believe that those for whose use the chattel is supplied will realize its dangerous condition; and (c) fails to exercise reasonable care to inform them of its dangerous condition or of the facts which make it likely to be so." <u>Id.</u> (quoting Restatement, Torts, § 388)).

Under North Carolina law, "state-of-the-art evidence helps shape the duty owed by the alleged tortfeasor." <u>Horne v. Owens-Corning Fiberglas Corp.</u>, 4 F.3d 276, 280 (4th Cir. 1993). "State of the art represents all of the available knowledge on a subject at a given time, and this includes scientific, medical, engineering, and any other knowledge that may be available." <u>Id.</u> "State of the art includes the element of time: What is known and when was this knowledge available." <u>Id.</u> at 281. State-of-the-art evidence may include reference to "OSHA regulations" and "OSHA-mandated guidelines." <u>Id.</u> "State-of-the-art evidence, because it often is scientific in nature and results from a cumulative review of a field over time, should not be applied retroactively

13

to *discredit* conduct at a given time prior to the culmination of the relevant research." Id. (italics in original). "Subsequent findings and standards," however, may be used "to *credit* prior conduct." Id. (italics in original).

In this case, plaintiff seeks damages for developing sinonasal cancer from wood dust (Compl. ¶¶ 10, 20, 25, 26 (2)).[7] Thus, the issue presented is whether defendants had a duty to warn plaintiff of a danger of developing sinonasal cancer from wood dust, during the exposure period. For multiple reasons set forth below, based upon undisputed evidence in the record, defendants did not have a duty to warn plaintiff of a danger of developing sinonasal cancer from wood dust during the exposure period. Defendants' duty is informed both by the state of the art during the exposure period, and by the unforeseeability of risk of harm to a consumer such as plaintiff's father. The court addresses these issues in turn below.

a.    State of the Art

The state of the art regarding carcinogenicity, as reflected in OSHA HazCom regulations and the definitive scientific sources to which they point for reliance, is that wood dust was not known to be a carcinogen until designated as such by the IARC in 1995. In that year, IARC published its monograph declaring, for the first time, "[w]ood dust *is carcinogenic to humans*." (DE 211-14 at 204) (italics in original).[8] In that same year, OSHA stated that, due to the findings in the 1995 IARC monograph, "the MSDS for hardwood species and those sheets for mixed species

---

[7] Although plaintiff originally asserted claims also based upon a failure to warn of the danger of developing sinonasal cancer from formaldehyde, (see, e.g., Compl. ¶ 20), plaintiff does not pursue a claim in opposition to summary judgment based upon formaldehyde, and bases his claims solely on wood dust. (See, e.g., Opp. to Wy Mot. (DE 218) at 10; Opp. to G-P Mot. (DE 221) at 9).

[8] The 1995 IARC monograph resulted from an IARC meeting held in October, 1994. For the purposes of the instant motions, the difference in time between meeting and monograph is immaterial. For ease of reference, the court specifies herein 1995 as the transformational year for state of the art.

of hardwoods and soft woods <u>must be identified as a carcinogen</u> as required under 29 CFR 1910.1200(g)(2)(vii)." (DE 211-26 at 2) (emphasis added).

Prior to 1995, OSHA HazCom regulations did not require identification of wood dust as a carcinogen.  Importantly, OSHA HazCom regulations during the exposure period, starting in 1983, stated that "a definition criteria for what constitutes a carcinogen for purposes of this standard is necessary since there may be differences of opinion concerning certain substances."  (48 Fed. Reg. 53295).  "OSHA has concluded that a chemical is to be identified as one which poses a carcinogenic hazard when either the [NTP], [IARC], or OSHA itself, publishes a finding that the available information indicates the chemical is a potential or confirmed carcinogen."  (<u>Id.</u>).  During the exposure period, neither NTP nor IARC had published such a finding with respect to wood dust.  Plaintiff also has not brought forth any other "available knowledge" of carcinogenicity of wood dust constituting state of the art during the exposure period.  <u>Horne</u>, 4 F.3d at 280.

Thus, based on the state of the art during the exposure period, wood dust was not a known cause of sinonasal cancer, "the harm for which damages are sought," N.C. Gen. Stat. Ann. § 99B-5(a),  nor should it have been known as a carcinogen.  As a result, defendants did not have a duty to warn plaintiff that wood dust was a carcinogen.

Plaintiff nonetheless raises several categories of evidence in an effort to establish defendants had a duty to warn plaintiff wood dust was a carcinogen during the exposure period.  None of these create a genuine issue of material fact.  For example, plaintiff describes materials produced by defendant Weyerhaeuser during the exposure period as showing "the dangers associated with wood products."  (Opp. G-P Mot. (DE 221) at 10; <u>see</u> Opp. Wy. Mot (DE 218) at 10).  But, whether defendants should have warned generally of "dangers associated with wood products" is not a material issue in this case.  Rather, the material issue is whether there was a duty

to warn of "the harm for which damages are sought," N.C. Gen. Stat. Ann. § 99B-5(a), here developing sinonasal cancer from exposure to wood dust. Three out of four of the cited materials refence hazards of wood dust but do not mention carcinogenicity. (DE 223-24; DE 223-25; DE 220-44).

In a fourth cited report, from 1987, defendant Weyerhauser states: "Much of the current research devoted to investigating the health effects of wood and wood dust say that some wood dusts have a tendency to promote . . . nasal cancer." (DE 223-23 at 14). Similarly, Weyerhaeuser MSDSs cited by plaintiff from the same time state: "Wood dust has been alleged to cause nasal / paranasal sinus cancer (certain European hardwoods, oak and beech)." (DE 215-27 at 2; 215-28 at 2). However, because these statements are limited to describing research claims and allegations, instead of conclusions, as well as limited to "some wood dusts," or hardwoods, or excluding yellow pine, the statements do not define the state of the art regarding carcinogenicity of wood dust as pertinent to the instant case. Moreover, the MSDSs expressly note wood dust is "Not listed" in any NTP, IARC, or OSHA "Carcinogenicity Listing." (Id.).

Likewise, plaintiff cites a 1985 Georgia-Pacific MSDS that states "[e]xposure to wood dust has been statistically associated with nasal cancer in British furniture workers." (DE 211-10 at 5). Because the statement describes only a "statistical[] associat[ion]" limited to a population to which plaintiff does not belong, the statement likewise does not define the state of the art regarding carcinogenicity of wood dust as pertinent to the instant case. As plaintiff also notes, this distinction is made plain in the MSDS itself, which expressly states: "<u>CARCINOGENICITY:</u> Not listed in <u>Second Annual Report on Carcinogens</u>, NTP, 1981." (DE 223-26 at 5) (underlining in original). Thus, defendants' internal documents do not constitute a state of the art determination that wood dust causes cancer.

Plaintiff suggests that a statistical association between wood dust and cancer in some contexts is equivalent to a state of the art determination that wood dust is a carcinogen or wood dust causes cancer. For example, plaintiff cites to the 1981 IARC monograph, where IARC states: "[t]here is *sufficient evidence* that nasal adenocarcinomas have been caused by employment in the furniture-making industry," and "a series of reports dated back to 1965 . . . indicated unusually high relative risks of nasal cancer . . . in workers" in the wood and leather industries. (DE 211-9 at 88 (italics in original); Opp. to G-P Mot. (DE 221) at 13 n. 5; Opp. to Wy. Mot (DE 218) at 12 n. 4). Plaintiff also points to a "sampling of studies examining the relationship between wood dust exposures and sino-nasal cancer back to the mid-1970s." (Opp. to G-P Mot. (DE 221) at 11; Opp. to Wy. Mot (DE 218) at 11). For example, plaintiff cites to a 1978 article entitled "Nasal cancer associated with occupational exposure to organic dust," and a 1993 article stating that "[t]he association between nasal cancer and wood dust exposure was first observed . . . in England in the 1960s." (Id.).

The pertinent issue, however, is whether the state of the art during the exposure period viewed a statistical association, or connection between nasal cancer and certain occupations, populations, or contexts, as synonymous with wood dust being designated as a carcinogen or causing cancer. Plaintiff cites to no evidence treating the two as synonymous during the exposure period. Indeed, the contemporaneous evidence in the record suggests to the contrary, particularly where OSHA "determined that a definition criteria for what constitutes a carcinogen for purposes of this standard is necessary since there may be differences of opinion concerning certain substances," and "OSHA has concluded that a chemical is to be identified as one which poses a carcinogenic hazard when either the [NTP], [IARC], or OSHA itself, publishes a finding that the available information indicates the chemical is a potential or confirmed carcinogen." 48 Fed. Reg.

53295; see also "NIOSH Evaluation of Its Cancer and Rel Policies" (DE 220-22) (outlining NIOSH development of cancer classifications, including during exposure period). Plaintiff has not pointed to an alternative definitional framework, during the exposure period, sufficient to qualify as "state of the art" at that time. See Horne, 4 F.3d at 280.

Moreover, the importance of the "carcinogenicity" designation in the state of the art during the exposure period is illustrated by the fact that NTP, NIOSH, and IARC do not designate wood dust as a carcinogen during the exposure period, but then later do expressly identify wood dust as a carcinogen after the exposure period. If their earlier findings were equivalent to a determination that wood dust is a carcinogen, then there would have been no need for a further, and different, statement that wood dust is a carcinogen in the 1995 IARC monograph, and NTP publication. (DE 211-14 at 204; DE 215-25). [9]

Plaintiff also argues that defendants' knowledge of the "carcinogenic properties" of their own products "is not determined by when such was recognized by a governmental agency." (Opp. to G-P Mot. (DE 221) at 14; Opp. to Wy. Mot (DE 218) at 14). Plaintiff contends that "because a governmental agency has yet to formally declare substance or product a danger does not mean a manufacturer should not know of such dangers from either its own testing or the medical, industrial and scientific literature." (Id. at 16). This argument misses the mark for two reasons.

---

[9] Plaintiff describes in factual summary, not tied to any particular argument, testimony by Aronson and Jones interpreting the 1981 IARC monograph and 1987 NIOSH report. For example, plaintiff summarizes Aronson's testimony as being "that as early as 1981 IARC had determined that the excess risk of cancer found in the furniture and cabinet making industry primarily occurred to those exposed to wood dust." (Opp. to G-P Mot. (DE 221) at 5; Opp. to Wy Mot. (DE 218) at 5). Plaintiff also claims that Jones testified "that in 1987 NIOSH had recognized the carcinogenicity of wood dust." (Opp. to G-P Mot. (DE 221) at 6; Opp. to Wy Mot. (DE 218) at 5). This testimony is neither relevant nor reliable to the state of the art issue discussed in the text above. It is not relevant because it constitutes the expert witnesses' current interpretation of the documents, which speak for themselves, and the testimony does not show how the documents were understood during the exposure period. In addition, the testimony is not reliable because neither expert offers any basis in methodology for their interpretations, other than their own statements, contrary to the statements in the 1995 IARC monograph and contemporaneous OSHA interpretations as set forth above. Therefore, the court excludes the cited testimony for purposes of the instant analysis pursuant to Federal Rule of Evidence 702(c) and (d).

18

First, while OSHA is a government agency, it does not purport to define by itself the state of the art, but rather expressly references the existing medical, industrial and scientific literature, including IARC. See 48 Fed. Reg. 53295. The IARC monographs, in turn, comprise a comprehensive review of a massive amount of underlying medical, industrial and scientific literature, "with the help of international working groups of experts in chemical carcinogenesis and related fields." (IARC 1995 monograph (DE 211-14) at 4, 19-40). "The *Monographs* . . . involve[] examination of all relevant information in order to assess the strength of the available evidence that certain exposures could alter the incidence of cancer in humans." (Id. at 19) (emphasis added). "The *IARC Monographs* are recognized as an authoritative source of information on the carcinogenicity of a wide range of human exposures." (Id. at 20). Again, plaintiff points to no more definitive source regarding state of the art on carcinogenicity of wood dust during the exposure period than the IARC monographs.

Second, with respect to independent "testing" by defendants, plaintiff does not explain how possibly defendants could have undertaken further medical or scientific testing of cancer and independent review of testing by others in a manner superior to or different from IARC or underlying studies referenced in IARC monographs. Case law cited by plaintiff regarding a duty to independently test a product is instructively distinguishable. For example, plaintiff cites Morgan v. Cavalier Acquisition Corp., 111 N.C. App. 520, 528 (1993), for the proposition that "a manufacturer must inform itself about what safety designs and methods are available in its industry and is under a duty to make reasonable tests and inspections to discover any latent hazards." Morgan, however, does not support plaintiff's argument that defendants should have undertaken individual medical or epidemiological studies, or reviews of studies, to determine if wood dust is

a carcinogen, where comprehensive research on the issue was already available through IARC, and where OSHA directed defendants to rely upon, inter alia, IARC determinations of carcinogens.

Similarly inapposite are cases cited by plaintiff for the proposition that a manufacturer must test for latent defects in a product. For instance, in Cockerham v. Ward, 44 N.C. App. 615, 623, (1980), the court stated that a "manufacturer has . . . [a] duty in properly constructing the article and in not placing upon the market a commodity which is defective and likely to inflict injury." In Red Hill Hosiery Mill, Inc. v. MagneTek, Inc., 138 N.C. App. 70, 75 (2000), the court stated that "a manufacturer has the duty to use reasonable care throughout the manufacturing process, including making sure the product is free of any potentially dangerous defect in manufacturing or design," and "[t]his duty of care may involve inspection or testing of the product." Id. (emphasis added). In the context of this case, where plaintiff is not asserting a claim based upon negligent design or manufacturing, the cited duty to test for manufacturing or design defects is inapposite.

Moreover, wood is not like a device or product that is manufactured exclusively by an entity, or small group of entities, who are uniquely privy to its component hazards or properties, such as the vending machine in Morgan, 111 N.C. App. at 528, the rubber straps in Cockerham, 44 N.C. App. at 622-23, or fluorescent lighting fixture in Red Hill Hosiery Mill, 138 N.C. App. at 71. Rather, it is a raw material that is ubiquitous, which can be harvested and distributed by anybody. Thus, the statements in the law regarding a manufacturer's "testing" of its own product are not reasonably transferrable to wood.

Plaintiff also cites testimony of Georgia-Pacific employee Hughes for the proposition that defendants knew that wood dust can cause nasal cancer during the exposure period, and that defendants had a duty to warn consumers of known dangers. The first proposition, however, is

not supported by the cited testimony. Indeed, plaintiff does not cite testimony by Hughes, but rather an exchange between counsel:

> MS. PACKER: The topic is when did Georgia-Pacific first learn of -- that exposure to wood dust can cause nasal cancer.
>
> MR. FRIELING: Those are absolutely the questions I'm going to ask him.
>
> MS. PACKER: Yes. We first learned, as we have already disclosed to you, in at least 1987, which is prior to 1989 –

(Hughes Dep. 82-83). Plaintiff's counsel then proceeds to ask Hughes whether Georgi-Pacific "would have been aware of" certain studies referenced in the following statement: "The association between occupational exposure to wood dust and various forms of cancer has been explored in many studies and in many countries." (Id. at 84-85). As discussed previously, awarenesses of an association, or studies exploring the same, are not equivalent of knowledge that wood dust is a carcinogen during the exposure period. Plaintiff also cites the following question and answer:

> Q. . . . my question is: If Georgia-Pacific knows of its product having a particular danger, it should tell its customers, right?
>
> A. If it's a proven known danger, then yes.

(Huges Dep. 96) (emphasis added). This testimony does not support plaintiff's argument that defendants had a duty to warn plaintiff that wood dust causes cancer during the exposure period. First, plaintiff is not a customer of Georgia-Pacific, but rather a customer of stores that sell Georgia-Pacific products. Second, the question asked of Hughes presumes the very fact for which plaintiff lacks evidence, that the danger for which plaintiff seeks damage, sinonasal cancer, was a "proven known danger" of wood dust during the exposure period. (Id.).

In sum, the state of the art is insufficient to establish a duty to warn plaintiff that wood dust was a carcinogen during the exposure period.

b.    Foreseeability of Risk to Consumer

In addition, and in the alternative, plaintiff has not established a duty to warn because there was no foreseeable risk of cancer from wood dust for a retail consumer of mostly softwood products, such as plaintiff's father, during the exposure period.  Under North Carolina law, a duty to warn arises only if the product creates a dangerous condition that the manufacturer knew posed a substantial risk of harm "to a reasonably foreseeable claimant" or "a reasonably foreseeable user or consumer."  N.C. Gen. Stat. § 99B-5(a)(1) & (2).

Here, plaintiff fails to bring forth any evidence that wood dust posed a reasonably foreseeable risk of harm to a retail consumer of mostly softwood products and pine wood scrap. Rather, a substantial risk of harm, if at all, was identified during the exposure period for persons working in the furniture and cabinet making industry, and for exposure to hardwood wood dust in that occupational setting. As noted previously, the 1981 IARC monograph stated: "There is *sufficient evidence* that nasal adenocarcinomas have been caused by employment in the furniture-making industry." (DE 211-9 at 88) (italics in original; underlining added).  The 1987 NIOSH report also noted an association to "occupations involving exposure to wood dust," with the association "particularly strong among furniture industry workers." (DE 215-24 at 33) (emphasis added). "Similarly, exposure to hardwoods has been implicated most often, but there are several reports implicating softwoods as well." (Id.).

Defendants' MSDSs during the exposure period adequately addressed the risks identified in these reports.  For instance, the 1985 Georgia-Pacific MSDS states: "Avoid prolonged or repeated breathing of wood dust in air," and "[e]xposure to wood dust has been statistically associated with nasal cancer in British furniture workers." (DE 211-10 at 4 - 5).    (Id.). Weyerhaeuser MSDSs, bearing "revised" dates April 1988 and July 1989, state: "Wood dust has

been alleged to cause nasal / paranasal sinus cancer (certain European hardwoods, oak and beech)." (DE 215-27 at 2; 215-28 at 2).

Stated differently, defendants already provided an "adequate warning" to address the substantial risk of harm that was foreseeable during the exposure period, and plaintiff has not shown a basis for providing further warning for unforeseeable risk of harm to consumers of mostly softwood products. Plaintiff has not brought forth evidence to create a genuine issue of material fact that additional warnings should have been provided during the exposure period.

Plaintiff suggests that defendants should have more widely distributed their MSDSs to consumers or, in the case of Weyerhaeuser, to employees who took home scrap wood. Plaintiff also suggests that defendant should have added a warning to their wood products, or used displays to show warnings in retail stores. However, given the occupational context of the risks identified during the exposure period, and the types of wood implicated, plaintiff has not demonstrated that any additional or different warning was required to address a reasonably foreseeable risk of harm to a consumer such as plaintiff's father.[10]

In support of alternative handling of MSDSs, plaintiff suggests without evidentiary support that defendants should have provided MSDSs to consumers or employees who took wood home. (See, e.g., Opp. to Wy. Mot. (DE 218) at 17; Opp. to G-P Mot. (DE 212) at 17). While plaintiff's expert, Jones, testified as to her opinion that the HazCom standard required MSDSs to "be distributed down the chain with the product, so [the MSDSs] have both an employee and a

---

[10] While the court recognized in its September 20, 2018, order that plaintiff and his father may have, in fact, under their individual circumstances processed such an unusually high volume of wood to approximate an "occupational or industrial setting" for purposes of a present-day specific causation analysis, 2018 WL 4517616, at *14, the different issue presented for the instant foreseeability analysis is the perspective of defendants in relation to the risks "to a reasonably foreseeable claimant" or "a reasonably foreseeable user or consumer," who is a retail customer and who is a mechanic employee who obtained scrap wood from the mill during the exposure period. N.C. Gen. Stat. § 99B-5(a)(1) & (2).

consumer target audience," (Jones Dep. 34), this opinion must be excluded as unreliable because it is not supported by applicable HazCom rules in force during the exposure period. (See, e.g., 52 Fed. Reg. 31882; 59 Fed. Reg. 6145-6146; OSHA interpretations (DE 211-23, 211-24, 211-25)).

In addition, the only support plaintiff offers for affixing labels on the wood products themselves or providing display notices, is by citing to a federal regulation that required, in 2018, labeling of wood products as being compliant with formaldehyde standards. (See Opp. to Wy. Mot. (DE 218) at 16 n. 9; Opp. to G-P Mot. (DE 212) at 17 n. 9). This citation is inapposite, however, because it is a current labeling requirement, not evidence of labeling duties during the exposure period. Furthermore, plaintiff offers no evidence equating formaldehyde risks and labeling factors with those of wood dust.[11] For example, there is no evidence in the record regarding the propriety of treating all wood products equally in terms of wood dust labeling, particularly those softwood products that comprised the most substantial portion by far of wood acquired by plaintiff's father. (See, e.g., T. Lightfoot Dep. 69, 71-76, 81; Pl's Dep. 243). There is no basis in the record, for instance, for finding that wood suppliers such as defendants had a duty to place a wood dust warning label on every pine board sold or discarded as scrap, as opposed to more specialty furniture or cabinetry items or types of wood.

In sum, plaintiff has not established a genuine issue of fact that defendants owed a duty to warn plaintiff's father, as a consumer of mostly softwood products and scrap products, of a risk of harm arising from such products. Therefore, for this additional reason, summary judgment must be granted to defendants due to plaintiff's failure to establish an essential element of his claims.

---

[11] Plaintiff also suggests in argument a parallel between wood dust and other carcinogenic substances such as asbestos and tobacco, but provides no evidentiary basis for equating the risks posed and associated duties to warn for each.

2.      Proximate Cause

Summary judgment also must be granted for defendants due to plaintiff's failure to establish a genuine issue of fact on the element of proximate cause. As part of the causation element in a failure to warn case, a plaintiff must demonstrate that "the failure to provide adequate warning or instruction was a proximate cause of the harm for which damages are sought." N.C. Gen. Stat. § 99B-5(a). "Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred, and one from which a person of ordinary prudence could have reasonably foreseen that such a result, or consequences of a generally injurious nature, was probable under all the facts as they existed." Hairston v. Alexander Tank & Equip. Co., 310 N.C. 227, 233 (1984).

In the context of a failure to warn, a plaintiff must establish both that plaintiff or responsible family member would have read a warning, and that they would have changed their behavior as a result of it. See Carlson v. Bos. Sci. Corp., 856 F.3d 320, 324 (4th Cir. 2017); Sparks v. Oxy-Health, LLC, 134 F. Supp. 3d 961, 994 (E.D.N.C. 2015); Holley v. Burroughs Wellcome Co., 74 N.C. App. 736, 742–43 (1985). For example, this court has held:

> plaintiff can point to no testimony or other evidence that plaintiff or [his coworker] would have changed his behavior had he read or been given adequate warnings of the nail gun's propensities. In light of that absence, the court agrees with defendant, that the best crafted manual, warning, or instruction imaginable would have been a futile measure, because plaintiff or [his coworker] would have done nothing differently upon its receipt. Furthermore, the inference that an adequate warning would have resulted in a change of behavior is the product of speculation from the record; the court cannot permit a question to go to the jury upon mere speculation of proximate cause.

Edwards v. ATRO SpA, 891 F. Supp. 1074, 1078 (E.D.N.C. 1995).

Here, plaintiff fails to establish a genuine issue of fact on the element of proximate cause for two independent reasons. First, as a threshold matter, there is a lack of evidence regarding the

types of warnings that could have been used during the exposure period, their content, their manner of presentation, and their location.  There is insufficient evidence regarding the manner in which a warning could have been communicated plaintiff's father, and the impact that warning could have had on a consumer such as plaintiff's father.  Where the state of the art during the exposure period did not support a broad unequivocal statement that wood dust is a carcinogen, or wood dust causes cancer, there is insufficient evidence that other types of qualified warnings would have impacted behavior of a consumer such as plaintiff's father.

For example, plaintiff points to the 1981 IARC monograph that states: "There is *sufficient evidence* that nasal adenocarcinomas have been caused by employment in the furniture-making industry."  (DE 211-9 at 88). Plaintiff also points to the 1987 NIOSH report that states: "[T]he association between nasal adenocarcinoma and wood dust exposure is particularly strong among furniture industry workers, although other woodworkers have also been shown to be at risk." (DE 215-24 at 33). However, there is no reliable evidence in the record permitting an inference that a warning bearing such qualified language on a sticker or display at a point of sale, or at a scrap wood discard pile, would have had any impact on a consumer of wood, where such consumer is not employed in the furniture-making industry.  Plaintiff's expert, Jones, does not provide such an opinion, even though suggestion is made that other such warnings should have been provided. (Cf., e.g., Jones Rep. (June 21, 2017) (DE 220-4) at 6; Jones Decl. (DE 220-7) ¶ 41 (noting failure of defendants to provide "MSDS or other health warnings" to a "customer").

Second, there is insufficient evidence that plaintiff's exposure to wood dust would have been reduced meaningfully if hypothetical warnings had been communicated to plaintiff's father. Even today, after plaintiff's father has been personally informed by plaintiff and plaintiff's attorney that wood dust allegedly caused his son to be afflicted with sinonasal cancer, plaintiff's

father wears a dust mask "sometimes," and he states "<u>I don't do it like I should</u>, but I do wear a mask if I'm doing <u>a lot of</u> sawing and <u>a lot of</u> sanding." (T. Lightfoot Dep. 52) (emphasis added). If plaintiff's father only wears a dust mask sometimes after having been warned directly and personally of the carcinogenicity of wood dust, it is not reasonable to infer that he would have procured or worn a dust mask, or required his son to wear a dust mask, during the exposure period on the basis of nothing more than a generalized, largely inapplicable, warning on a product or at point of sale.

Other undisputed facts in the record also contribute to the implausibility of any inference that plaintiff or plaintiff's father would have worn a dust mask during the exposure period. Plaintiff's father never did "any research to try to figure out if there were safety precautions that [he] should take in the shop involving wood dust." (<u>Id.</u> at 84). From the perspective of plaintiff's father, plaintiff did not "ever complain about working in the shop, or say that he didn't want" to do a particular task: "[H]e didn't complain because he knew it wouldn't do any good." (<u>Id.</u> at 88). With reference to dust in the shop, plaintiff's father said "basically, . . . look, a little dirt not going to hurt you." (<u>Id.</u> at 126). With respect to safety precautions in the shop, plaintiff's father testified as follows:

> Q. Once you built the shop, did it ever have to undergo any inspections from, say, the fire department or --
>
> A. No, it was just a home project thing.
>
> Q. Did you take any measures yourself to add any particular ventilation system to the shop?
>
> A. I just built the shop. I just built a basic shop.
>
> Q. Did you add any ventilation system of any sort?
>
> A. No.
>
> Q. Do you have -- was it heated and air-conditioned?

A. No, it was just an old country shop.

(Id. at 48).

Plaintiff's father also had a variety of power tools in the shop, including "a table saw, circular saw, band saw . . . sanders, grinders, drills, whatever it took to get the job done." (Id. at 45). By the end of the exposure period, plaintiff was doing "just about" everything plaintiff's father was doing in the shop. (Id. at 62). Despite the alleged high volume of production at the shop, plaintiff's father agreed that "operations at [the] shop were nothing - - were set up nothing like the operations at the Weyerhaeuser mill," in "no way like Weyerhaeuser." (Id. at 139-140). Safety precautions implemented at the shop were "not to put [plaintiff's] hand in the blade, and how to avoid getting cut, and stuff like that," where plaintiff's father stated: "I learned that by myself. Commonsense." (Id. at 140; Pl's Dep. 267-268). Plaintiff never wore hearing protection, safety goggles, or gloves while working in the shop. (Pl's Opp. G-P Stmt. (DE 222) ¶ 20). Plaintiff points to no evidence of any safety precautions taken because of any warnings in manuals associated with the power tools in the shop or any other safety warnings during the exposure period. (See, e.g., Pl's Dep. 267-268, 312-131, 397; T. Lightfoot Dep. 166-167; Boelhouwer Dep. 92).

Furthermore, an additional break in the causal chain, rendering any inference of causation conjectural, is the undisputed fact that plaintiff sometimes worked in the shop in the vicinity of power tools, chemicals, and wood dust, independently and unsupervised, repeatedly for multiple hours at a time. (See, e.g., Pl's Dep. 231-232, 254, 336-337, 366). Indeed, plaintiff "typically . . . would work a couple hours" in the shop alone on a school day afternoon during his middle school years, which could include "cleaning" or "sand[ing] a project that was already put together" while his father was "at work." (Pl's Dep. 254). It is speculative whether plaintiff would have worn a dust mask or taken other precautions to protect himself during such work.

In sum, based upon all of the foregoing, it is speculative whether plaintiff would have meaningfully avoided wood dust exposure, or protected against exposure to breathing in wood dust, if an unspecified warning had been provided. Plaintiff argues that a declaration by plaintiff's father creates a genuine issue of fact as to causation. For example, plaintiff's father states in his declaration: "When I purchased wood from retail outlets, I was not informed that wood dust could cause cancer." (T. Lightfoot Decl. ¶ 12). In addition, he states: "If I had been informed that wood dust could cause cancer from Weyerhaeuser and Georgia Pacific's wood products I would have changed the manner in which I worked with the wood products." (Id. ¶ 15). "Specifically," he states, "I would have worn a dust mask and required my son, [plaintiff], to do the same, and followed any additional warnings provided." (Id. ¶ 16).

The statements in the declaration are insufficient to create a genuine issue of material fact for two reasons. First, they do not address the nature of the warning that could or should have been provided to plaintiff's father during the exposure period, consistent with the state of the art at the time. His statement, "[i]f I had been informed that wood dust could cause cancer from Weyerhaeuser and Georgia Pacific's wood products," (id. ¶ 15), is conclusory and generalized, not tied to any evidence about the contents or nature of any warning communication method to which plaintiff's father could have been exposed. Second, the conclusory statement in the declaration that he "would have worn a dusk mask and required" plaintiff to do the same, (id. ¶ 16), is contradicted by his more specific testimony regarding the lack of safety precautions in the shop during the exposure period.

"[I]t is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace, 681 F.2d at 241 (quotations omitted). In this instance, in light of all the aforementioned undisputed facts in

the record, a "verdict in favor of the non-moving party" based on the statements in the declaration "would necessarily be based on speculation and conjecture." Myrick, 395 F.3d at 489. In addition, plaintiff cannot "create a dispute about a fact that is contained in deposition testimony by referring to a subsequent affidavit of the deponent contradicting the deponent's prior testimony." In re Family Dollar FLSA Litig., 637 F.3d 508, 512 (4th Cir. 2011).

At bottom, there is insufficient evidence to create a triable issue of fact with respect to the issue of whether "the failure to provide adequate warning or instruction was a proximate cause of the harm for which damages are sought." N.C. Gen. Stat. § 99B-5(a). Therefore, summary judgment must be granted to defendants on this element of causation. Because summary judgment must be granted on this element of causation, and on the element of duty as discussed further above, the court does not reach defendants' additional arguments with respect to general causation and specific causation, or admissibility of expert testimony with respect to the same. Where summary judgment is warranted with respect to liability, the court also does not reach plaintiff's claim for punitive damages.

## CONCLUSION

Based on the foregoing, defendants' motions for summary judgment (DE 209, 213), are GRANTED, and plaintiff's claims are dismissed as a matter of law. The clerk is DIRECTED to close this case.

SO ORDERED, this the 21st day of February, 2020.

LOUISE W. FLANAGAN
United States District Judge